**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0267n.06

No. 09-3613

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Apr 29, 2010**

LEONARD GREEN, Clerk

| | |
|---|---|
| PATRICK ANOSIKE ANYAKUDO; IJEOMA SYLVIA ANYAKUDO,[1] <br><br> Petitioners, <br><br> v. <br><br> ERIC H. HOLDER, JR., Attorney General of the United States, <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS

BEFORE:  GIBBONS and GRIFFIN, Circuit Judges; and DOWD, District Judge.[*]

GRIFFIN, Circuit Judge.

Patrick Anosike Anyakudo ("Anyakudo"), and his wife, Ijeoma Sylvia Anyakudo,[1] natives and citizens of Nigeria, petition for review of an order of the Board of Immigration Appeals ("BIA" or "Board") affirming an immigration judge's ("IJ") denial of Anyakudo's application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[2]  Because

---

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

[1]Anyakudo listed his wife as a derivative beneficiary.

[2]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, G.A. Res. 39/46, U.N. GAOR 39th Sess., Supp. No. 51 at 197, U.N. Doc. A/39/51 (1984); *see also* implementing regulations at 8 C.F.R. § 208.18.

Anyakudo has failed to demonstrate a well-founded fear of future persecution, we conclude that his petition lacks merit.[3] Accordingly, we deny the petition for review.

I.

From 1999 to 2006, Anyakudo worked as a translator for the United States Drug Enforcement Agency ("DEA") in Bangkok, Thailand, and the local Royal Thai Police. Anyakudo's principal responsibility was translating wire taps of various Nigerian dialects into English for use by the DEA in disrupting narcotics trafficking. Over a five-year period, Anyakudo translated conversations leading to the arrests of thirteen Nigerian drug traffickers and approximately fifty couriers who were sponsored by traffickers.

On September 8, 2006, there was a military coup d'état in Thailand, and the new government suspended wiretapping. As a consequence, Anyakudo found himself without employment and, thus, was required to leave Thailand prior to the expiration of his work visa. Instead of returning to Nigeria, Anyakudo and his wife secured tourist visas, which allowed them to travel to the United States as visitors for pleasure. The visas were issued on October 23, 2006, and expired on May 3, 2007. Prior to their expiration, however, Anyakudo filed an application for asylum, withholding of removal, and CAT protection. Anyakudo sought asylum based on: (1) his status as "a member of

---

[3]Anyakudo does not appeal the denial of his claim for CAT protection.

the social group of former U.S. government agents known to work in opposition to the drug trade[,]"
and (2) his political opinion.[4]

At his removal hearing, Anyakudo testified that he was concerned Nigerian drug traffickers had become aware of his occupation as a translator working with the DEA and intended to harm him and/or his family as a result. Anyakudo described several incidents, which he believed justified his fear. First, he recounted how three uninvited guests attended his January 18, 2003, marriage celebration in Nigeria. Because Anyakudo was unable to identify the men, and they did not appear to partake in the celebration, he concluded that these three individuals were connected to the drug trade. Anyakudo continued by noting that he encountered one of the men again during a ten-day trip he took to Nigeria in 2005. Although Anyakudo was visiting his old neighborhood, and the man only looked at him, Anyakudo determined that the man must have followed him.

Second, Anyakudo testified regarding a conversation he translated on August 17, 2004, from the wiretap of a suspected drug trafficker. In that discussion, the caller said: "[W]e were able to get some information about that guy, he's an [I]bo man working with American agents for the past 4 years." The other party responded that "there has been speculation that DEA recruited an [I]bo and Yoruba man for a while now to translate conversations." To which the caller replied: "Funny part is, this guy understand [sic] both Yoruba and Igbo languages. Don't worry we hope he'll come

---

[4]Anyakudo asserts that his "strong belief in eradicating the drug trade from Nigeria" constitutes a political opinion.

back." Anyakudo testified that he believed the description fit him, and that he faxed the transcript to his superiors, who instructed him to be "cautious."

Third, Anyakudo indicated that he had received several reports from his family in Nigeria regarding suspicious activity and strangers making inquiries about his work. He specifically recounted how his sister had contacted him in August of 2004 to inform him of a call she received from unknown individuals questioning her about his job in Thailand. Anyakudo also testified that his sister's home had been burgled and that he suspected drug traffickers were to blame.

Lastly, Anyakudo introduced correspondence he received from his family expressing their fears for his safety and cautioning him about returning to Nigeria. One such letter was a January 11, 2007, e-mail from his brother, which stated:

> [S]ome men came asking us about you and your family in[]fact [I] smell danger they want to kill you,[]because of the nature of your job over[]there,[]from their conversation they said you investigated and ap[p]rehended one of their boy[s] and because you are the chief security officer working under DRUG ENFORCEMENT AGENCY {DEA} []according to them they said the boy is currently serving a jail term,[]so they are seriously looking for you . . . .

Despite these perceived threats, Anyakudo testified that he did not report these incidents to the Nigerian authorities because he believed they were "in partnership with [the drug traffickers]" and would not protect him on account of his race and religion. Anyakudo also submitted with his application for asylum a United States Department of State Country Report on Nigeria, which he argues demonstrates "that the Nigerian government was rife with corruption involving the drug trade," and "that police were largely unable to effectively curb drug trafficking[.]"

On September 5, 2007, the IJ denied Anyakudo's application for asylum, withholding of removal, and CAT protection. Although the IJ found Anyakudo to be credible, he concluded that Anyakudo had not demonstrated that he was a member of a social group as recognized under applicable law. Moreover, the IJ found that Anyakudo had not shown it was more likely than not he would be harmed or tortured if he returned to Nigeria. The BIA affirmed, holding, in part, that Anyakudo had not established that either "corrupt Nigerian officials will . . . target him for reprisals, or that the Nigerian government would be unable or unwilling to protect him from these individuals or other criminal elements in Nigeria."

Anyakudo and his wife timely petition for review.

II.

"When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). We "directly review[] the decision of the IJ while considering the additional comment made by the BIA." *Id.* (internal quotation marks and citation omitted).

We review questions of law de novo and factual findings under the substantial evidence standard. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). Factual findings must be sustained if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole[,]" and they are "conclusive" unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 247 (internal quotation marks and citations omitted).

Asylum may be granted to an alien who qualifies as a "refugee," which is defined as one "who is unable or unwilling to return to . . . [his home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A). An applicant for asylum bears the burden of demonstrating that "persecution is a reasonable possibility" if he returned to his country of origin. *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal quotation marks and citation omitted). An applicant is not required to demonstrate that he will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). The applicant's testimony, if deemed credible, may be sufficient to sustain his burden of proof without corroboration. 8 C.F.R. § 1208.13(a).

Even if not entitled to asylum, an alien may secure withholding of removal if he can show that his "life or freedom would be threatened in that country [to which he would be sent] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b). The petitioner must establish a "clear probability of persecution[.]" *INS v. Stevic*, 467 U.S. 407, 413 (1984). To meet this standard, the applicant must demonstrate that "it is more likely than not" he will be persecuted upon his return. 8 C.F.R. § 1208.16(b)(2).

> Unlike an application for asylum, however, a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and it only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country.

Furthermore, a greater quantum of proof is required as to the likelihood of persecution in the country of risk in order to establish eligibility for withholding. In other words, the courts consider the same factors to determine eligibility for both asylum and withholding, but in the case of withholding, a higher probability of persecution is required.

*Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003).

To be eligible for CAT protection, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (defining and discussing "torture"). We will uphold the BIA's decisions concerning withholding of removal and CAT protection unless they are "manifestly contrary to the law." *Castellano-Chacon,* 341 F.3d at 545 (internal quotation marks and citation omitted); 8 U.S.C. § 1252(b)(4)(C). "Thus, the BIA's determination should be upheld unless evidence not only supports a contrary conclusion, but indeed *compels* it." *Zhao*, 569 F.3d at 247 (internal quotation marks and citation omitted).

III.

Based on the evidence of record, the IJ ruled that Anyakudo failed to establish a well-founded fear of persecution because the perceived threats to his safety were speculative and not substantiated. We agree.[5] There is no evidence suggesting that the persons who contacted Anyakudo's sister, or burglarized her home, were Nigerian drug traffickers. Similarly, the uninvited guests were never identified or connected in any way to the drug trade. Although Anyakudo claims one of the men

---

[5]Because we conclude that Anyakudo has failed to demonstrate a well-founded fear of future persecution, we do not decide whether the IJ and BIA correctly determined that Anyakudo was not a member of a cognizable social group and did not express a political opinion.

from his wedding followed him during his 2005 visit to his old neighborhood, the individual made no effort to harm Anyakudo at that time, even though Anyakudo remained in Nigeria for ten days. *See Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) ("[A]n [asylum] applicant cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution.") (internal quotation marks and citations omitted).

Only two incidents may fairly be characterized as connected to the drug trade. The first is the August 17, 2004, wiretapped conversation between two individuals purportedly identifying Anyakudo. Yet, even after being alerted to this possible threat, Anyakudo visited Nigeria in 2005 for approximately ten days, during which time he traveled socially to his old neighborhood and saw a friend. "A well-founded fear of future persecution has both a subjective and an objective component: an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Perkovic*, 33 F.3d at 620-21 (quoting *Cardoza-Fonseca*, 480 U.S. at 430-31, 440). Anyakudo's testimony regarding his fear of persecution is strongly undercut by his decision to return voluntarily to Nigeria for a ten-day visit notwithstanding these alleged threats. Moreover, Anyakudo was not harmed during his stay in Nigeria.

The second incident is described in the January 11, 2007, e-mail in which Anyakudo's brother indicated that some men had inquired about Anyakudo's whereabouts. These men allegedly told his brother that Anyakudo had "investigated and ap[p]rehended one of their boy[s.]" However,

this report fails to convey an explicit threat. We have held that, to demonstrate persecution, "the conduct on which the application for asylum is based must go beyond what might reasonably be characterized as mere harassment . . . ." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005). Indeed, "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).

Here, no one threatened to harm, nor actually harmed, Anyakudo or his family. At most, they received generalized threats from suspected drug traffickers. Such non-specific threats, standing alone, are insufficient to establish past persecution or a well-founded fear of future persecution, particularly in light of Anyakudo's decision to visit Nigeria for ten days after being made aware of the potential danger.

Nor did Anyakudo demonstrate that he was targeted by officials of the Nigerian government, or by individuals the government was unwilling or unable to control. *See Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) ("[T]he petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution."). As Anyakudo acknowledges, in most instances, he had "no idea" about the identities of the persons who allegedly threatened his safety. Moreover, Anyakudo failed to report any of the perceived threats to Nigerian authorities, and his allegation that Nigerian officials would not have assisted him is speculative and unsubstantiated by the evidence.

Based on the following, we uphold the IJ's and BIA's determinations that Anyakudo has not carried his burden of proof for asylum under § 208 of the INA, 8 U.S.C. § 1158(a), which requires him to demonstrate a well-founded fear of future persecution in Nigeria based on his alleged membership in a particular social group, or because of his political opinion. *Cardoza-Fonseca*, 480 U.S. at 428. Moreover, because his burden of proof is greater when seeking withholding of removal under § 241(b)(3)(B) of the INA, 8 C.F.R. § 1208.16(b), this claim fails as well. The IJ's and BIA's decisions, "considered as a whole," are "supported by reasonable, substantial and probative evidence" and do not compel a contrary conclusion. *See Zhao*, 569 F.3d at 247.

IV.

For these reasons, we deny the petition for review.