NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0190n.06
Filed: March 12, 2007

Nos. 05-3667 and 05-4335

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BTISSAM TAGHZOUT and RACHID BENAYAD, | ) ) ) | |
| Petitioners, | ) ) | On Appeal from the Bureau of Immigration Appeals |
| | ) | |
| v. | ) | |
| | ) | |
| ALBERTO R. GONZALES, Attorney General, | ) ) ) | |
| | ) | |
| Respondent. | ) | |

**Before:** **GILMAN and SUTTON, Circuit Judges; and HOOD, District Judge.**[*]

**HOOD, DENISE PAGE, District Judge.** Petitioner Btissam Taghzout, as the primary applicant, and her husband, Rachid Benayad, filed an application for asylum, withholding of removal, and protection under the United Nations Convention against Torture ("CAT"). The immigration judge denied the asylum application as untimely. The immigration judge thereafter reconsidered and denied the asylum application on the merits, finding that Taghzout had not established past persecution or a well-founded fear of future persecution. The immigration judge also denied Taghzout's alternative application for withholding of removal. The Board of Immigration Appeals ("BIA") affirmed the immigration judge's decision. The BIA also denied a

_____

* The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

motion to reopen the process to review Benayad's application for adjustment of status based on an I-140 petition. For the reasons set forth below, we affirm the BIA's decisions.

## I.  BACKGROUND

Taghzout and Benayad, both Muslims, are natives and citizens of Morocco. They were neighbors and began spending time together alone and in secret in 1990. After two or three years, Benayad proposed marriage to Taghzout, but her father refused permission. Benayad asked Taghzout's father again two or three years later but Taghzout's father refused permission. Taghzout claims that her family refused to give her permission to marry because she brought money into the household from her work as a secretary and she did the cooking and housework.

In 1998, Benayad came to the United States as a visitor and stayed. Benayad and Taghzout were able to keep in touch by way of letters because Taghzout was the one who went to the post office to pick up the mail. They occasionally spoke by telephone. Taghzout's father died in 1999 and her uncle became responsible for the family.

Taghzout secretly saved money from her paychecks and Benayad sent her money so that she could come to the United States. Taghzout was able to obtain a visa and purchase a plane ticket to the United States. She came to the United States on September 9, 2001. Benayad requested Taghzout's uncle's permission to marry Taghzout, but it was refused. Benayad and Taghzout were married in a mosque in Ann Arbor, Michigan on October 11, 2001. Their daughter, Sofia, was born in August 2002.[1] Taghzout's uncle was furious when he learned of the marriage. Taghzout had ignored the Muslim rules followed in Morocco by marrying on her own without someone present who is responsible for her to give her away in marriage. The marriage will not be recognized by

---

[1] A second daughter was born in February 2005. (Case No. 05-4335, J.A. 44)

2

Taghzout's family nor by the Moroccan government. If they return to Morocco, Taghzout's uncle will allegedly be able to separate the family and force Taghzout to marry another man. Benayad believes that his family would not be safe anywhere in Morocco because Morocco is a small country and the uncle could find them.

Taghzout's application for asylum was dated September 3, 2002. (J.A. 288) Taghzout signed a supplemental form dated October 7, 2002. (J.A. 289) The asylum application was not filed until October 10, 2002 because Taghzout was recuperating from a difficult pregnancy and had hoped that her uncle would now accept her marriage due to the birth of the child. (J.A. 280, 130) Taghzout was represented by an attorney, Alexander Azzam, who was responsible for mailing the application. The asylum application was referred to the immigration court. A Notice to Appear was filed on December 4, 2002 against Taghzout and Benayad, initiating the removal proceedings against them for remaining in the United States beyond the approved time. (J.A. 361, 371)

On March 26, 2003, a hearing on the removal proceedings was held, at which time Taghzout and Benayad conceded removal. (J.A. 98) Counsel at the hearing indicated that there was a pending asylum application by Taghzout. (J.A. 98-99) The asylum application hearing was scheduled for June 30, 2003 and later rescheduled to April 20, 2004. (J.A. 100-02, 338-39) On April 2, 2004, new counsel requested a continuance of the April 20, 2004 hearing date, claiming ineffective assistance of prior counsel. Respondent opposed the motion and the immigration judge denied the motion, stating that Taghzout had not complied with the requirements for showing ineffective assistance of counsel and further that her "claims of lack of knowledge of evidentiary requirements to prove her case are without merit." (J.A. 319) The immigration judge allowed substitution of counsel as long as counsel was prepared to go forward on the date of the scheduled hearing. (J.A. 320)

3

At the hearing on April 20, 2004, Taghzout appeared with new counsel and renewed her request for a continuance for an additional sixty days to attempt to obtain affidavits from family members in Morocco. (J.A. 111-12) New counsel attempted to submit an envelope as evidence that new counsel had been unable to obtain the file from former counsel. (J.A. 111-12) The immigration judge denied the request for further continuance, stating that Taghzout had almost 13 months from the initial hearing to obtain any evidence to be presented at the hearing. (J.A. 114) Taghzout moved to amend her application for asylum, replacing the stated fear of persecution on account of her political beliefs with a fear of persecution on account of her membership in a particular social group, which was granted by the immigration judge. (J.A. 114-15, 284, 288)

Taghzout and Benayad testified at the hearing. The following documents were presented at the hearing: 1) the Department of State Country Report on Human Rights Practices (Morocco) for 2003 (J.A. 263-78); 2) Souad Eddouada, Feminism and Politics in Moroccan Feminist Non-Governmental Organizations, (April 2001) (J.A. 179-84); 3) Shahrzad Mojab, "Honor Killing": Culture, Politics and Theory, Vol. XVII Nos. 1, 2 (Association for Middle East Women's Studies) (Spring/Summer 2002) (J.A. 186-94); 4) Julia Beamish & Lina Tazi Abderrazik, Adolescent and Youth Reproductive Health in Morocco, (POLICY Project (USAID), Futures Group International) (January 2003) (J.A. 196-233); 5) Prayer Profile: The Moroccan Arabs of Morocco (Bethany World Prayer Center) (1997) (J.A. 235-37); 6) Malikiyyah, Maliki, Malikis, Believe Religious Information Source, at http://mb-soft.com/believe/txw/maliki.htm (J.A. 239-40); and, 7) Nadia Masid, Islam Working Against women in Morocco, pp. 1-18 (unpublished, undated) (J.A. 242-59) The article on honor killing and the undated paper by Nadia Masid were excluded by the immigration judge. (J.A. 107-111; 161)

4

Based on the testimony and evidence submitted at the hearing, the immigration judge found that Taghzout failed to support her application for asylum based on fear of persecution because she has been threatened with mistreatment by her family, physical harm for having a relationship, or being in a relationship with her husband for years before marriage and opposing customs and traditions. (J.A. 35) The immigration judge noted that Taghzout did not testify that she had been threatened with physical harm by anyone in her family, but merely testified that she was given no reason by her father for the two rejections of her now-husband's offer of marriage, nor did Taghzout testify that she was threatened with physical harm for opposing customs and traditions. (J.A. 46-47) The immigration judge found that Taghzout had testified that upon her return, "well, she might be separated from her husband and daughter by her uncle, who refused to accept the marriage." (J.A. 47) The immigration judge also found that Taghzout's claim that she was restricted by her family in her activities was inconsistent with Taghzout's testimony that she was able to obtain employment as a secretary, was able to obtain a passport from the restrictive Moroccan government (apparently on her own), was able to go to the Embassy to obtain a visa, purchase an airline ticket and depart the country without the permission of her uncle, who, according to Taghzout, had the right to oversee and restrict her movements. (J.A. 48) The immigration judge noted that Taghzout presented no evidence regarding the fundamentalist Islamic branch to which her family belonged and failed to introduce any evidence of harm exacted upon Islamic women who marry against the wishes of their family. (J.A. 49) The immigration judge found that the evidence submitted by Taghzout did not show that women who marry outside of the wishes of their families but within the context of Sharia law are subject to outside dissolution of their marriage by nonconsenting family members. (J.A. 50)

The immigration judge held that Taghzout failed to meet her burden under CAT to show

acquiescence of an official to torture. (J.A. 53) Taghzout did not submit any evidence to show that the Moroccan government was aware of the harm Taghzout claims she would suffer if she returns to Morocco–the dissolution of the marriage by the family. (J.A. 53) The immigration judge found that Taghzout presented no evidence to support her assertion that the Moroccan government would not accept the determinations of the Imam and the practice of Sharia law in the United States and not recognize her marriage to Benayad. (J.A. 53-54) The immigration judge denied the applicants any form of relief, but granted their request for voluntary departure to Morocco in a summary oral decision entered on April 20, 2004. (J.A. 54)

Taghzout and Benayad timely filed an appeal with the BIA on May 3, 2004. (J.A. 11) On May 4, 2005, the BIA affirmed the decision of the immigration judge. (J.A. 6-7) The petition for review before this court was timely filed on June 2, 2005. (J.A. 57)

On August 2, 2005, Taghzout and Benayad filed a Motion to Reopen and Remand before the BIA, claiming that Benayad obtained an approved Employment Certification from the Department of Labor and filed a petition I-140 for an adjustment of status based on employment. (Case No. 05-4335, J.A. 25-27) The BIA denied the motion in a September 29, 2005 Order. (Case No. 05-4355, J.A. 5-6) On October 27, 2005, a petition for review of the BIA's denial was timely filed with the court. The hearings on appeal of the denial of both the asylum application and the motion to reopen were consolidated.

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

This Court has jurisdiction over final orders by the BIA under 8 U.S.C. § 1252. The court is without jurisdiction to review an immigration judge's determination regarding an application's

6

timeliness. 8 U.S.C. § 1158(a)(3); *See Castellano-Chacon v. INS,* 341 F.3d 533, 544 (6th Cir. 2003).

In asylum cases, the standard of review of the immigration judge's factual findings is deferential: factual findings are conclusive, unless the court determines that the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 484, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The BIA's determination against withholding the removal of an alien must be upheld unless it is "manifestly contrary to the law." *Castellano-Chacon,* 341 F.3d at 552.

A decision of the BIA to deny a motion to reopen is reviewed for abuse of discretion. *Sinistaj v. Ashcroft,* 376 F.3d 516, 519 (6th Cir. 2004).

## B.    One-Year Filing Deadline

Petitioners claim that the BIA erred in affirming the immigration judge's dismissal of their asylum application because it was filed beyond the one year filing deadline. Petitioners claim extraordinary circumstances existed to excuse the untimely filing. Taghzout's application for asylum was dated September 3, 2002. (J.A. 288) Taghzout signed a supplemental form dated October 7, 2002. (J.A. 289) The asylum application was filed on October 10, 2002. (J.A. 280) The government argues that this court lacks jurisdiction to review the immigration judge's determination that Taghzout's asylum application was not timely filed and that she failed to establish extraordinary circumstances warranting tolling.

Aliens seeking asylum must apply within one year of their arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). The alien must demonstrate by clear and convincing evidence that the application has been timely filed. *Id.* An untimely application may be considered if the alien demonstrates "to the satisfaction of the Attorney General either the existence of changed

7

circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period." 8 U.S.C. § 1158(a)(2)(D). No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2) regarding the time limit. 8 U.S.C. § 1158(a)(3). In *Castellano-Chacon,* we held that "we are barred from reviewing the BIA's decision denying [Petitioner's] application on the basis that it was untimely and must therefore affirm the BIA's decision on this point" in light of 8 U.S.C. § 1158(a)(3), which states that, "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." *Castellano-Chacon,* 341 F.3d at 544. Our decision in *Almuhtaseb v. Gonzales,* 453 F.3d 743 (6th Cir. 2006), modified *Castellano-Chacon's* blanket pronouncement, holding that it "bar[s] our review of asylum applications denied for untimeliness only when the appeal seeks review of discretionary or factual questions, but not when the appeal seeks review of constitutional claims or matters of statutory construction." 453 F.3d at 748.

In the present case, Taghzout's challenge to the timeliness determination by the immigration judge centers on the *factual finding* that the application was not filed by the governing deadline and the *discretionary ruling* that no extraordinary circumstances warranted an extension of time. We therefore lack jurisdiction to review the timeliness decision and we decline to reach the merits of Taghzout's asylum application.

## C.    Constitutionality of the One-Year Filing Deadline

Petitioners also argue on appeal that the establishment of a one-year deadline is unconstitutional because it violates and contradicts an international treaty to which the United States is a party. Petitioners' constitutional argument does not identify a specific constitutional right which has been violated, other than stating that the deadline violates an international treaty, specifically,

8

the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267 (1967), which Petitioners claim has been in effect since the 1951 United Nations Convention Relating to the Status of Refugees (the Refugee Convention, 189 U.N.T.S. 150, 152 (1951)).

We note that the United States is not a signatory to the 1951 Refugee Convention, but is a signatory to the 1967 Protocol Relating to the Status of Refugees, which incorporates the substantive provisions of Article 2 through 34 of the Refugee Convention. 19 U.S.T. 6223. The Sixth Circuit addressed this issue in *Castellano-Chacon,* holding that an alien cannot circumvent the one year filing deadline and make a claim under the Refugee Protocol since it is not self-executing and therefore is not judicially enforceable law in the United States. *Castellano-Chacon*, 341 F.3d at 544. The Sixth Circuit further held that the United States' treaty obligations are implemented in section 241(b)(3) of the INA, 8 U.S.C. § 1231, which deals with applications for withholding of removal and does not provide a time limit. *Id.* Petitioners' argument that the one-year deadline is unconstitutional because the deadline violates the Refugee Protocol is not supported by the law in this circuit.

**D.     Withholding of Removal and Relief under CAT**

In the alternative, Taghzout claims the immigration judge erred in denying her application for withholding of removal. The burden of proof for withholding of removal is more exacting than that for asylum and an alien who does not qualify for asylum cannot meet the higher standard for withholding removal. *Mikhailevitch v. I.N.S.,* 146 F.3d 384, 391 (6th Cir. 1998). Despite lacking jurisdiction to review the immigration judge's decision on the timeliness of asylum application, we have jurisdiction to review the denial of requests for withholding of removal and relief under CAT.

9

*See* 8 U.S.C. § 1252(b)(4); *Castellano-Chacon,* 341 F.3d 545-53. An alien seeking withholding of removal must demonstrate "that there is a clear probability that he will be subject to persecution if forced to return to the country of removal" on account of his race, religion, nationality, membership in a particular social group, or political opinion. *Singh v. Ashcroft,* 398 F.3d 396, 401 (6th Cir. 2005) (quotation omitted); 8 U.S.C. § 1231(b)(3)(A). In order to show relief under CAT, an alien must show that it is "more likely than not that he ... would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

On review, we must uphold an immigration judge's findings and conclusions unless "manifestly contrary to the law," and any findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4). Credibility findings are considered findings of fact and are afforded substantial deference. *Yu v. Ashcroft,* 364 F.3d 700, 702 (6th Cir. 2004). Findings of fact by the immigration judge must be supported by specific reasons "based on issues that go to the heart of the applicant's claim" and not merely irrelevant inconsistencies. *Sylla v. INS,* 388 F.3d 924, 925-26 (6th Cir. 2004). We may reverse the immigration judge's factual determination only if "the evidence not only supports a contrary conclusion, but indeed *compels* it." *Klawitter v. INS,* 970 F.2d 149, 152 (6th Cir. 1992).

Taghzout's counsel at closing arguments before the immigration judge indicated that Taghzout's claim was not based on past persecution but fear of future persecution based on her membership in a particular social group. (J.A. 159) The immigration judge made findings on both claims of past and future persecutions. The immigration judge's findings noted the differences between her testimony and her statements in her asylum application. In her application, Taghzout stated that she was mistreated by her family for having a relationship with her husband years before

10

the marriage and that she had been threatened with physical harm for opposing customs and traditions. (J.A. 46) The immigration judge found that Taghzout failed to establish past persecution by her family in light of Taghzout's testimony that her relationship with her husband did not become known to her family until she left Morocco. (J.A. 46) The immigration judge noted that Taghzout did not testify she had been threatened with physical harm by anyone in her family for opposing customs and traditions and her relationship with her husband while she was still in Morocco. (J.A. 46-47)

Addressing the fear of future persecution claim, the record shows that Tagzhout testified at the hearing that she and her husband were neighbors but that her father or stepmother did not know they were seeing each other. (J.A. 120, 126) Her husband proposed twice while they were in Morocco. (J.A. 120) She testified her father did not accept the proposal and did not give her a reason for the refusal. (J.A. 121) Benayad again proposed to Taghzout when they were in United States. (J.A. 122) Benayad contacted Taghzout's uncle for her hand in marriage because the uncle became responsible for the family after the death of her father. (J.A. 124) The uncle did not accept Benayad's proposal. (J.A. 122) Taghzout and Benayad were married one month after Taghzout arrived in the United States. (J.A. 125) Taghzout told her family of the marriage but they did not accept the marriage. (J.A. 125-26) Taghzout further testified that she did not speak directly to her uncle because he was furious and he did not wish to speak with her. (J.A. 128) Taghzout testified that she was afraid to return to Morocco because her uncle is still furious and has sworn to separate her from her husband and child. (J.A. 128) Taghzout testified that she could not seek protection from the Government because they would not believe her. (J.A. 129) Taghzout did not testify to any physical threats either by her father or her uncle. The immigration judge concluded that other

than a threat to separate Taghzout from her husband and family, Taghzout failed to show that she may suffer future persecution by her uncle and other family members. (J.A. 48)

As to Taghzout's claim that she belongs to a social group–women who refuse to follow the norms of their society and wish to marry outside of their families' wishes–the immigration judge found this evidence insufficient to establish that such a social group may have a claim for protection under the INA, although Taghzout submitted significant evidence of a patriarchal domination of women within the country of Morocco. (J.A. 51) The immigration judge found that Taghzout failed to establish: the existence of such a group; that there is an affiliation (or close affiliation) within this group; that they have a common motive or interest; that there is a voluntary relationship that exists; or that the members view themselves as a group. (J.A. 50-51)

Taghzout cited *In Re S-A-,* 22 I. & N. 1328, 1335 (BIA June 27, 2000) to support her claim that the BIA has recognized that Moroccan women are subject to control by their fathers. In *In Re S-A-*, the BIA did not undertake an analysis of whether the woman in that case was a member of a group cognizable under the INA. However, the BIA recognized that the Moroccan woman suffered repeated physical assaults, imposed isolation, and deprivation of education which did not come from the government, but from her own father, and that the Moroccan authorities would have been unable or unwilling to control her father's conduct. *Id.* at 1335. Even if Taghzout could show that she is a member of a particular social group that may receive protection under the INA, Taghzout did not establish by her testimony that she may suffer future persecution by her family–in particular, her uncle, or the government. The immigration judge's factual findings are supported by the record and the conclusions of law are not manifestly contrary to the law. There is insufficient evidence to support a contrary finding on review and we affirm the immigration judge's determination denying

12

the requests for withholding and relief under CAT.

**E.      Due Process**

Taghzout and Benayad claim that the immigration judge improperly denied their claim for a continuance in this matter. The government argues that this court lacks jurisdiction to review the immigration judge's denial of petitioners' request for a continuance of the removal hearing. After the government filed its brief, however, this court rejected a virtually identical argument in *Abu-Khaliel v. Gonzales*, 436 F.3d 627, 633-34 (6th Cir. 2006).

The court in that case held that the grant or denial of a continuance did not fall within the category of discretionary decisions that the courts of appeals are barred from reviewing. *See id.* Regardless of the merits of the government's argument, the panel is bound by the decision in *Abu-Khaliel* and reviews the denial of a continuance under the abuse-of-discretion standard of review. *See id.* at 634.

An alien is entitled to a full and fair hearing on her immigration claims. *Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001). Due process in immigration proceedings requires a full and fair hearing. *Huicochea-Gomez,* 237 F.3d at 699. An immigration judge has broad discretion in how she conducts a hearing regarding any given petitioner and her decision is reviewed only for abuse of discretion. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998); *Onyeme v. INS,* 146 F.3d 227, 231 (4th Cir. 1998). Whether the hearing is fair, and thus the process provided is *adequate*, depends upon whether the petitioner is able to show prejudice. When a person has no hearing or opportunity to be heard whatsoever, the process is inadequate. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ; *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55

13

L.Ed.2d 252 (1978) (holding that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions").

On March 26, 2003, a hearing was scheduled before the immigration judge. The petitioners were represented by counsel who requested an adjournment of the hearing. The immigration judge granted the request and rescheduled the hearing for June 30, 2003 and then for April 20, 2004. (J.A. 94, 101, 366). Prior to the April 20, 2004 hearing, petitioners sought to substitute counsel. The immigration judge granted the request only if new counsel was ready to proceed on the scheduled hearing date. (J.A. 320) New counsel appeared at the April 20, 2004 hearing date requesting a further continuance claiming additional evidence and affidavits were required. (J.A. 111-12) The motion was denied because the immigration judge found that more than a year had passed and that the clients had waited until six weeks before the trial to prepare and obtain evidence. (J.A. 112) The immigration judge ruled that the delay in attempting to prepare for the case did not require the judge to delay consideration of the case, especially when 13 months had passed since the date was scheduled. (J.A. 114)

The immigration judge did not abuse her discretion in denying the motion for continuance, in light of the fact that the hearing had been scheduled for more than a year.

## F.     Motion to Reopen

On August 2, 2005, Benayad filed a Motion to Reopen and Remand before the BIA, claiming that Benayad had obtained an approved Employment Certification from the Department of Labor and filed a petition I-140 for an adjustment of status based on employment. The BIA denied the motion. Benayad claims the BIA erred in denying his Motion to Reopen the case.

The Attorney General has the discretion to adjust the status of an alien under 8 U.S.C. §

14

1255(a) if: 1) the alien makes an application for such adjustment; 2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and 3) an immigrant visa is immediately available to the alien at the time the application is filed. 8 U.S.C. § 1255(a); *Daneshvar v. Ashcroft,* 355 F.3d 615, 625 (6th Cir. 2004). The Supreme Court has held that the abuse of discretion standard applies to the judicial review of the Board's determination of motions to reopen. *INS v. Abudu,* 485 U.S. 94, 96, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). The Board has broad but not unlimited discretion. *Babai v. INS,* 985 F.2d 252, 255 (6th Cir. 1993) (quoting *Mejia-Carillo v. INS,* 656 F.2d 520, 522 (9th Cir. 1991)).

In its denial, the BIA held that Petitioners failed to establish that they are *prima facie* eligible for adjustment of status. (Case No. 05-4335, J.A. 5) The BIA found that although Benayad demonstrated he is the beneficiary of an Application for Alien Employment Certification (Form ETA 750), which has been certified by the United States Department of Labor, there is no evidence that he is the beneficiary of an approved Immigration Petition for Alien Worker (Form I-140). (Case No. 05-4335, J.A. 5) The BIA concluded that, without an approved Form I-140 and a current priority date, a visa is not immediately available and Petitioners cannot establish *prima facie* eligibility for adjustment of status. (Case No. 05-4335, J.A. 5) The BIA found that Petitioners' reliance on the BIA decision, *Matter of Velarde*, 23 I & N Dec. 253 (BIA 2002), was misplaced since that case involved an adjustment of status based on a marriage entered into after the commencement of proceedings, whereas in this case, Petitioners seek adjustment of status based on Benayad's employment relationship. (Case No. 05-4355, J.A. 5)

Benayad states in his brief that there was no evidence that the I-140 was filed. He claims it was because the BIA denied the petition in less than two months and counsel did not have sufficient

15

time to provide such proof. Benayad claims the proof is now available and if the BIA had delayed its ruling, this matter could have been rectified. (Case No. 05-4355, Appellants' Br., p. 9) The government argues that visa numbers were unavailable in August and September of 2005 and visa numbers remained unavailable in January 2006. The government claims that Petitioners' argument that the BIA should have waited to rule until counsel could provide evidence of the Form I-140 filing should not be considered because during the eight weeks the matter was pending, counsel did not provide such evidence nor was there a request to delay the matter. The government argues that the regulations require all supporting documentation to be filed with a motion to reopen, and that the manual to practice before the BIA so provides. 8 C.F.R. § 1003.2(c)(1). Petitioners do not provide any explanation as to why the evidence was not provided to the BIA or the reason for the delay.

The BIA's decision was not an abuse of its discretion because Benayad was unable to show that he received an immigrant visa, or that the visa was immediately available to him at the time he applied. Petitioners did not provide any explanation as to why the appropriate documents were not provided to the BIA nor any indication as to when the documents would be provided. Petitioners have not shown that the BIA had the obligation to wait until such documentation was provided before issuing its decision. In any event, the BIA waited two months before issuing its decision. Petitioners have not submitted any evidence to rebut the Government's statement that visa numbers were unavailable in August and September of 2005 and that the numbers remain unavailable through January 2006. Petitioners have failed to establish a *prima facie* case that they are entitled to an adjustment of status.

### III.  CONCLUSION

For the reasons set forth above, the BIA's decisions denying the application for asylum, the

16

withholding of removal, protection under the CAT, and the motion to reopen are affirmed.