**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0436n.06

No. 10-3874

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Apr 24, 2012**

LEONARD GREEN, Clerk

JOYCE MUSHAYAHAMA, )
)
    **Petitioner,** )
)    **ON PETITTION FOR REVIEW**
v. )    FROM THE BOARD OF
)    IMMIGRATION APPEALS
ERIC H. HOLDER, JR., Attorney General, )
)    **O P I N I O N**
    **Respondent.** )
)

**Before: COLE and MERRITT, Circuit Judges, and VARLAN, District Judge.**[*]

**THOMAS A. VARLAN, District Judge.** Petitioner Joyce Mushayahama ("Mushayahama")

seeks review of a decision of the Board of Immigration Appeals ("BIA") affirming the decision of

the Immigration Judge ("IJ"). Mushayahama, a native and citizen of Zimbabwe, entered the United

States as an authorized visitor on November 17, 1999. She remained in the United States after her

authorization ended on May 16, 2000, and she applied for asylum with the Department of Homeland

Security ("DHS") on February 1, 2006. After conducting a hearing, Immigration Judge Brian M.

O'Leary issued a decision, ordering that Mushayahama's application for asylum be denied as

untimely, her application for withholding of removal under the Immigration and Nationality Act

("INA") § 241(b)(3) be denied, and her application for withholding of removal under the Convention

---

[*]The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of
Tennessee, sitting by designation.

Against Torture ("CAT") be denied. The IJ granted her application for voluntary departure in the alternative of removal, pursuant to INA § 240B(b), ordering that she depart within sixty (60) days. The BIA affirmed the IJ's decision, dismissing Mushayahama's appeal. Mushayahama then timely filed this petition for review. For the reasons set forth below, we **DENY** the petition for review of the BIA's denial of Mushayahama's application for asylum and withholding of removal claims under the INA, but we **GRANT** the petition as to the CAT claim and **REMAND** to the BIA for further proceedings.

## I. BACKGROUND[1]

Mushayahama was born in Harare, Zimbabwe in 1958. Mushayahama entered the United States as a non-immigrant visitor on November 17, 1999, with authorization to remain in the country until May 16, 2000. Mushayahama remained in the United States after 2000 without authorization from the DHS. Mushayahama is single and has one son, who lives in Chigungwiza, Zimbabwe, with Mushayahama's parents. Mushayahama has two brothers and two sisters, and she had a third brother, who is now deceased.

In Zimbabwe, Mushayahama and her family were forced to join the Zimbabwe African National Union-Patriotic Front ("ZANU-PF"), the ruling party in Zimbabwe. Despite the fact that she does not support the party, Mushayahama joined the ZANU-PF in 1981, paying membership dues and obtaining a membership card. Mushayahama felt compelled to attend meetings because

---

[1]The factual background is based upon Mushayahama's testimony at the July 18, 2007 hearing before the IJ, which he expressly found credible. The IJ found Mushayahama's testimony about the events sufficiently "detailed, plausible, and consistent with her application and with known background conditions in Zimbabwe," and "sufficient to meet [her] burden of proof." (A.R. at 62); *see also* INA § 240(c)(4)(C); 8 C.F.R. § 1208.13(a). Accordingly and because neither party challenges the facts as testified by Mushayahama, we accept this factual background for purposes of this petition.

the ZANU-PF took attendance at its meetings and remained informed of which individuals attended the meetings, intimidating or harming the person or property of those who were absent. While attending meetings, Mushayahama "did not speak out in opposition to the ruling party or question the political leaders." (A.R. at 57). ZANU-PF officials were not aware that Mushayahama did not support the party while she lived in Zimbabwe, as she continued to attend party meetings and pay her party membership dues.

In 1977, prior to Mushayahama's personal membership in the ZANU-PF, four armed men dressed in uniforms knocked on the door of Mushayahama's family's home late at night. The men forcibly entered her home, pointing guns at the family and using batons to force the family out of their home. When the family got outside, they noticed that one of Mushayahama's brothers was not with them. As her brother came out of the house, the soldiers had firearms pointed at him. Mushayahama's family pleaded with the men not to shoot, and the soldiers warned her brother to be careful next time the soldiers came to the house. Without any kind of search or arrest warrants, the men searched the house while the family waited on the ground outside. The men eventually left and warned the family not to report the incident to the police. Mushayahama believes that her parents were already members of the ZANU-PF at the time of the incident. While she was away at school, Mushayahama's parents' home had been searched in a similar manner four times previous to the incident in 1977.

While Mushayahama was away at teacher training college, her brother, Ricky, died under mysterious circumstances at the age of nineteen. Mushayahama's family informed her that her mother woke up late at night and discovered that Ricky was not inside the house. Mushayahama's mother and the other members of her family searched for Ricky, and Mushayahama's sister

discovered his dead body in the toolshed. Ricky's body was standing on the floor with a rope attached to the ceiling of the shed and loosely hanging on him, with blood on his private parts. The positioning of the body led Mushayahama's family to believe that he was murdered and did not commit suicide. No one was ever arrested as responsible for Ricky's death, and Mushayahama does not know who killed Ricky. Mushayahama's family suspected that he was murdered by ZANU-PF supporters because the police did not rigorously investigate the case.

In 1987, Mushayahama was raped by an unidentified man, who threatened her with a knife and threatened her family if she reported the incident. Mushayahama's family moved because of the rape, and she became pregnant and gave birth to her son as a result of the attack. Mushayahama does not know who committed the rape, but she believes the individual to have been a ZANU-PF supporter because party supporters often committed crimes and hid behind the ruling government.

Mushayahama was employed as a certified primary school teacher for over eighteen years in Zimbabwe, from 1981 until 1999. On her first day teaching at a school in Nyanwandoro, Zimbabwe, a man came into the school's office with an empty beer bottle, closed the door with Mushayahama and the school's deputy headmaster inside, and recited the ZANU-PF party slogan. The man then broke the bottle on a table and injured the deputy headmaster with it. The deputy headmaster sustained injuries, which led to his hospitalization. Mushayahama believes that the police took no action after they were called, such as arresting or prosecuting the man, because he was a ZANU-PF supporter.

Later while teaching, in 1997, Mushayahama was called to the headmaster's office at the school where she taught because a first-grade student had drowned, and the parents of a fourth-grade student, who were strong supporters of the ZANU-PF, reported that Mushayahama had encouraged

4

their son to drown the first-grader. The headmaster was aware that Mushayahama had no involvement in the drowning, but he encouraged her to sign a statement admitting responsibility, Mushayahama believes, because he feared the fourth-grade student's family's connections to the ZANU-PF. Mushayahama refused to sign a statement, and although they did not physically harm or threaten her, the parents of the fourth-grade student harassed her about the situation for three months.

Additionally, in 1998, a clerk from the same school was beaten by what Mushayahama believed to be a mob of ZANU-PF supporters. The other teachers and students hid and were frightened by the incident, and no members of the mob were ever arrested or prosecuted. Mushayahama believes that her status as a teacher makes her more likely to be harmed in Zimbabwe because teachers are targeted by the ZANU-PF.

Mushayahama obtained a travel and visitor's visa through a travel agent and left Zimbabwe for the United States in November 1999. Mushayahama never extended her visa and has remained in the United States since her initial entry into the country in 1999. Mushayahama did not return to Zimbabwe when her six-month visa ended because she was frightened that she would be tortured if she went back. Shortly after her arrival in the United States, Mushayahama lived with a family who represented that they wanted to assist her, but they required her to work for them without payment.

In May 2002, Mushayahama attempted to apply for political asylum while she was living in a shelter.[2] She met a pastor, who claimed that he would assist her, and she paid him $560.00 to do

---

[2]Mushayahama did not provide a copy of the 2002 asylum application. She informed the IJ that her former attorney retained her copy of the application.

so. After the pastor mailed the application for her, the application was returned because it contained insufficient information. When Mushayahama informed the pastor that the application was returned, he informed her that he would need $5,000.00 more to continue assisting her. Mushayahama did not have sufficient funds to pay the pastor for his continued assistance, and she did not attempt to apply for asylum again until 2005. She claims that the delay between the 2002 attempt and the current application, filed in 2006, is attributable to the fact that she had no one to assist her, and she believed at the time that she needed someone to obtain the asylum application for her. Mushayahama is able to read and write English.

Mushayahama fears returning to Zimbabwe because she has watched the news from Zimbabwe while in the United States, and she has seen reports that opposition supporters are tortured by ZANU-PF party members. Mushayahama fears being beaten, raped, electrocuted, or killed, if she returns. She will not be allowed to criticize the government if she returns to Zimbabwe, and she believes the fact that she has been absent from the country for so long will raise the ZANU-PF party members' suspicions. Mushayahama believes the government monitors telephone and other forms of communication in Zimbabwe, and she thus does not speak with her family members remaining in Zimbabwe about the ruling party over the telephone. Mushayahama believes she would not be safe in any part of Zimbabwe because the ZANU-PF presence is everywhere, and political violence occurs throughout the country.

The IJ addressed the following issues in his April 14, 2009 decision: "1) the one-year bar; 2) past persecution; 3) clear probability of future persecution; 4) nexus; 5) relief under CAT; and 6) voluntary departure." (A.R. at 53). First, the IJ found that Mushayahama's testimony regarding the searches of her home, her brother's death, the events related to the schools in which she worked, and

6

her rape was "detailed, plausible, and consistent with her application and with known background conditions in Zimbabwe." (A.R. at 62; *see* INA § 240(c)(4)(C)). Because the DHS did not point to a specific reason to doubt Mushayahama's testimony and because her testimony contained only minor inconsistencies insufficient to undermine her credibility, the IJ found her "testimony credible and sufficient to meet [her] burden of proof." (*Id.* (citing 8 C.F.R. § 1208.13(a)).

As to the one-year deadline for filing an application for asylum, the IJ addressed Mushayahama's argument that "extraordinary circumstances" should excuse the delay in the filing of her application. The IJ found that given Mushayahama's experiences in Zimbabwe and the fact that she was living in shelters and as an "unpaid domestic servant in an exploitative situation" when she arrived in the United States, Mushayahama's "unique situation constitutes 'extraordinary circumstances'" under 8 C.F.R. § 1208.4(5). (A.R. at 63). The IJ found, however, that Mushayahama did not sufficiently explain why she delayed so long in re-applying for asylum from the return of her May 2002 application until the end of 2005, when she started working with an attorney on her instant claim, particularly given her knowledge of the application process for asylum, which the IJ determined she gained form her "original exposure to the system." (*Id.*). The IJ thus found that Mushayahama did not re-apply within a reasonable time, as required, and that she is ineligible to apply for asylum because her present claim was not timely filed.

The IJ next addressed Mushayahama's application for withholding of removal pursuant to INA § 241(b)(3). Mushayahama sought withholding of removal by claiming that she suffered past, and is likely to suffer future, persecution in Zimbabwe on account of her imputed political opinion, because she was not an ardent ZANU-PF supporter, and because of her membership in two particular social groups: "female teachers who are not active party supporters" and "citizen[s] returning to

7

Zimbabwe after a long residence abroad." (*Id.*). The IJ determined that Mushayahama's experiences in Zimbabwe did constitute past persecution, by cumulatively rising to the required level of directly threatening Mushayahama's life and freedom. However, the IJ found that Mushayahama was "unable to demonstrate that she was harmed on account of her imputed political opinion" because she did not satisfactorily explain why the government would believe that she was reluctant to support the ZANU-PF, when she never spoke out in opposition to the government or openly took actions against it. (*Id.* at 64). The IJ then went through each of the instances in Zimbabwe and described how Mushayahama did not sufficiently demonstrate that the instances happened because she or her family were targeted by the ZANU-PF. Accordingly, the IJ did not find a sufficient nexus between Mushayahama's imputed political opinion and the past persecution she suffered for purposes of withholding of removal under INA § 241(b)(3).

As to the social groups that Mushayahama claimed membership in, the IJ rejected both. The IJ determined that the proposed group of "female teachers who are not party supporters," while sufficiently well-defined to delimit membership,[3] lacks a shared immutable or fundamental characteristic because the group members could change their profession to avoid persecution and lacks social visibility because the group members would not be identified in the community at large, while outside the classroom, as members of the group. (A.R. at 65). Moreover, the IJ found that Mushayahama's opposition to the ZANU-PF would not be recognizable to society at-large in Zimbabwe because she was a member of the party, attended meetings, and never manifested her

---

[3] While the IJ's decision first, in a dismissive fashion, lists that this social group is not "clearly delimited" as a reason supporting his finding that the group is insufficient for purposes of INA § 241(b)(3), the IJ later writes that the social group is sufficiently particularized to delimit membership. (A.R. at 65, 66).

opposition to the party. The IJ likewise determined that "citizens returning to Zimbabwe after a long residence abroad" was an insufficient social group to confer eligibility for withholding of removal under INA § 241(b)(3). (*Id.* at 66–67). This finding was based on the fact that while this group shares the immutable characteristic that members cannot change the fact that they have lived abroad, Mushayahama did not demonstrate that this proposed group is sufficiently socially visible and delimited because Mushayahama did not suggest a length of time away or a manner of return to Zimbabwe necessary to qualify for membership in the group.

As the IJ determined that Mushayahama did not establish past persecution on account of a protected ground, he found that she did not enjoy a regulatory presumption of a clear probability of future persecution and that she bore the burden of proving a clear probability of future persecution on the basis of a protected ground. The IJ found that Mushayahama did not meet her burden because she did not propose a legally cognizable social group. The IJ also rejected Mushayahama's arguments that there was a clear probability of future persecution based on her imputed political opinion opposing the ruling party, which she argued the ZANU-PF would be aware of because of her secret exit from Zimbabwe, her over ten-year residence in the United States, and the fact that she has been missing the ZANU-PF meetings during the period she has been abroad.

The IJ further determined that the Department of State Country Report for Zimbabwe in 2007 (the "Country Report"), in the record before the IJ, which Mushayahama attached as an exhibit in support of her claim that her citizenship would be revoked upon her return under the Zimbabwe Citizenship Act (the "Citizenship Act"), did not apply to her in the way that she asserted it did. The IJ found that "[t]he Country Report strongly suggests that citizens are subject to denaturalization after a five-year absence from the country only if they also hold foreign citizenship." (A.R. at 67).

9

The IJ pointed out that Mushayahama did not provide evidence of any instance where a citizen of Zimbabwe had her citizenship stripped, and further noted that Zimbabwe may regulate its citizenship as long as its regulations remain consistent with international law. Therefore, Mushayahama could not show that she would be subject to the Citizenship Act and stripped of her Zimbabwean citizenship upon her return.

The IJ rejected Mushayahama's claim that she is eligible for withholding of removal under the CAT because she did not "prove that it is more likely than not that she will be detained." (*Id.* at 68). Mushayahama claimed that she would be detained, arrested, or tortured if she returns to Zimbabwe. The IJ's conclusion rested on the fact that Mushayahama did not offer any evidence to show that she would be detained at the airport upon arrival or that the government in Zimbabwe regularly detains individuals returning from the United States or other countries. The IJ thus determined that Mushayahama did not show any reason why the ZANU-PF would have an interest in her specifically after her long absence.

Finally, the IJ granted Mushayahama's application for voluntary removal because Mushayahama had been of good moral character for the requisite period, because the IJ had no reason to believe she was an aggravated felon or a danger to the United States, and because she indicated that she was willing and able to depart if so required.

Applying a de novo standard of review, the BIA affirmed the IJ's finding that although she showed "extraordinary circumstances," Mushayahama did not adequately show that the delay in filing her application for asylum was reasonable. (A.R. at 3). The BIA likewise affirmed the IJ's finding that Mushayahama did not show that "any past persecution was, or future persecution would be, on account of a protected ground under the Act." (*Id.*). Specifically, the BIA found that

10

Mushayahama did not demonstrate that she would be targeted on account of her political opinion as she admitted that she was never detained or tortured by the ZANU-PF, she provided no evidence to indicate that the incidents that she described as having occurred in Zimbabwe were politically motivated, she did not show that the ruling party would think of her as an opposition supporter, and she did not show that she would more likely than not be harmed upon her return.

Additionally, like the IJ, the BIA found that the social groups proposed by Mushayahama were not sufficiently recognizable in society and that Mushayahama did not sufficiently show that it is more likely than not that she would be persecuted on the grounds of her membership in the proposed groups. The BIA dismissed the proposed group of female teachers opposed to the government for lack of evidence that the government would see her as a member of that group. With respect to the proposed social group of those returning after long stays abroad, the BIA addressed the Citizenship Act and cited to an online copy of the act to show that Mushayahama does not fall into the category of those who lose citizenship under it, primarily because she was born in Zimbabwe and attained her Zimbabwean citizenship through birth. Finally, as to the CAT claim, the BIA found that "the record does not indicate that it is more likely than not that [Mushayahama] will face torture by or with the acquiescence (to include the concept of willful blindness) of a member of the government of Zimbabwe upon her return to that country." (A.R. at 5 (citing *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006); 8 C.F.R. §§ 1208.16-12.08.18)).

This petition for review from the BIA's decision followed.

## II. ANALYSIS

### A.     Standard of Review

11

Where the BIA reviews the IJ's decision and issues a separate opinion instead of summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination. *See Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). However, to the extent the BIA adopts the IJ's reasoning, we also review the IJ's decision. *Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006). We review questions of law de novo, with substantial deference given "to the BIA's interpretation of the INA and accompanying regulations." *Morgan*, 507 F.3d at 1057 (citing *Sad v. I.N.S.*, 246 F.3d 811, 814 (6th Cir. 2001)).

We review the factual findings of both the IJ and the BIA under a substantial evidence standard. *Khalili*, 557 F.3d at 435 (citing *Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007)). Accordingly, the factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B).

**B.      Eligibility to for Asylum**[4]

As set out in *Almuhtaseb v. Gonzales*, we are barred from reviewing asylum applications denied for untimeliness when the petition seeks review of discretionary or factual questions. 453 F.3d 743, 748 (6th Cir. 2006). We have jurisdiction to review appeals for denials of untimely asylum applications only when the appeal involves "constitutional claims or matters of statutory construction." *Id.* In this case, the BIA agreed with the IJ's finding that Mushayahama had

---

[4]Pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, Mushayahama submitted a supplemental letter and citation on February 23, 2012. *See* Fed. R. App. P. 28(j). In this letter, Mushayahama, citing *Matter of L-S-*, 29 I. & N. Dec. 705 (BIA 2012), for the first time asserts that she is entitled to "humanitarian asylum" under 8 C.F.R. § 1208.13(b)(1)(iii)(A) or (B), if the court finds that she is ineligible for all other requested forms of relief. Because we find that her asylum claim is time barred and because Mushayahama raises this argument for the first time in supplemental briefing after oral argument on her appeal, we cannot consider this argument. *Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005).

12

sufficiently shown "extraordinary circumstances," which could excuse her failure to file an application for asylum within one year of arriving in the United States, pursuant to INA § 208(a)(2)(B), (D), 8 U.S.C. § 1158(a)(2)(D). The BIA also agreed with the IJ, however, that Mushayahama did not sufficiently show that "the alien filed the application within a reasonable period given those circumstances." (A.R. 3, 63; *see also* 8 C.F.R. § 1208.4(a)(5)).

Mushayahama admits that the issue of the reasonableness of the delay as determined by the BIA and IJ "is beyond the review of this Court," but "she maintains her eligibility for asylum for the record and includes the information on asylum [in her brief] because it is so closely linked to the related request for withholding of removal, which the Court can review." (Pet'r Br. 22, n.2). Respondent correctly argues that Mushayahama makes no constitutional or statutory construction claim related to her application for asylum in her petition for review and that this Court lacks the jurisdiction to review the BIA's dismissal of Mushayahama's application for asylum for failure to file it within a reasonable time given the "extraordinary circumstances" she faced. *See Almuhtaseb*, 453 F.3d at 748. Accordingly, we do not have jurisdiction to consider Mushayahama's claim insofar as it relates to asylum, and Mushayahama's petition for review is denied with respect to her asylum claim.

## C.     **Withholding of Removal** under the INA

Mushayahama argues that the BIA and the IJ improperly denied her application for withholding of removal pursuant to INA § 241(b)(3). Withholding of removal is mandatory if the applicant establishes that her "life or freedom would be threatened in [the proposed country of removal] on account of race, religion, nationality, membership in a particular social group, or political opinion." *I.N.S. v. Stevic*, 467 U.S. 407, 411 (1984) (citing 8 U.S.C. § 1253(h)(1)). As to

13

the burden of proof for establishing eligibility for withholding of removal under INA § 241(b)(3), "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(b). Section 8 C.F.R. 1208.16(b)(1)(i) further provides:

> If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim.

If the fear of future threat to life or to an individual's freedom did not result from past persecution, or if the applicant has not suffered past persecution, an applicant may still establish that it is "more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion" if removed back to the country. 8 C.F.R. § 1208.16(b)(2). An applicant is not required to prove that she would be singled out individually if the applicant "establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion," and that establishes her inclusion in and identification with the group to the extent that it is more likely than not that her life or freedom would be threatened if she returns to the country. 8 C.F.R. § 1208.16(b)(2).

Mushayahama claims that the BIA's and IJ's decisions were based on "an erroneous view of the law and upon factual conclusions unsupported by substantial evidence." (Pet'r Br. 22).

1.    **Political Opinion**

Mushayahama argues that she was persecuted on account of her political opinion and that this is evidenced by the fact that every incident of persecution she suffered was "either suspected or confirmed to be at the hands of the government or supporters of the ZANU-PF." (Pet'r Br. 27).

14

Mushayahama claims that her lack of additional support for the ZANU-PF beyond what was required of her was visible and caused an "anti-ZANU-PF" political opinion to be imputed to her. Mushayahama argues that because attendance is taken at the ZANU-PF party meetings, and she has been away from Zimbabwe for over a decade, any suspicion that the government may have previously had about her anti-ZANU-PF sentiments has been confirmed, and she will suffer persecution on account of her political opinion in the future. Mushayahama also iterates that she need only show that her political opinion, imputed or otherwise, was "one central reason" for the persecution, and she contends that she has shown that. (*Id.* at 29 (citing INA § 1208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i))). Respondent argues that Mushayahama failed to establish that she suffered past persecution on account of either her actual or imputed political opinion and that she was "an unfortunate victim of criminal activity." (Resp't Br. 22, 27).

In demonstrating that an applicant has been persecuted on account of a political opinion or membership in a particular social group, it is not enough for the applicant to present evidence that she had the political opinion or was a member of that social group. *See* 8 U.S.C. § 1101(a)(42)(A). The applicant must present evidence suggesting that she was persecuted on account of or because of the political opinion. *Id.*; *see also I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 479 (1992); *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). The applicant need not provide direct proof of the persecutor's motive, but must show some evidence, either direct or circumstantial, indicating that she was persecuted on account of her political opinion. *Elias-Zacarias*, 502 U.S. at 483; *Marku*, 380 F.3d at 987. The applicant "must show that 'she acted based on a political opinion' and that her actions were 'interpreted . . . as such' by her alleged persecutors." *Bu v. Gonzales*, 490 F.3d 424, 430 (6th Cir. 2007) (quoting *Marku*, 380 F.3d at 987). Although the Supreme Court has not decided

15

whether imputed political opinion can be a protected ground for purposes of withholding of removal, this Court has held that it is one. *Haider v. Holder*, 595 F.3d 276, 284 (6th Cir. 2010).

While Mushayahama suffered through many horrible events while in Zimbabwe, she has not proven that the past persecution she suffered was on account of or because of her political opinion, either imputed or actual. The IJ found that Mushayahama's experiences in Zimbabwe "rise to the level of past persecution." (A.R. at 63). However, no evidence was presented to suggest that the ZANU-PF would have ever perceived Mushayahama as holding a political opinion opposed to the ruling party. As the IJ and BIA both pointed out, by her own admission, Mushayahama never openly opposed the ZANU-PF or spoke out against it. Given her lack of open opposition to the ruling party, combined with her active membership in the party, paying dues and attending meetings, there is no indication that the ZANU-PF would have had any inclination that Mushayahama did not support the party. In fact, Mushayahama testified that she did not participate in demonstrations or organize against the government because she knew that participating "was not right" and she "didn't support what [the demonstrators] were doing." (A.R. at 99). When asked why she believes the government would consider her an individual who did not support the government given her lack of open opposition, she responded only that "they just suspect me as not a strong supporter." (*Id.* at 99–100). Whether Mushayahama privately and internally opposed the ZANU-PF is irrelevant if the ZANU-PF themselves did not perceive her as a member of the opposition. *See Adhiyappa v. I.N.S.*, 58 F.3d 261, 267 ("[T]he motives of the asylum seeker are relevant only to the extent that they illuminate the motives of the alleged persecutors."). Moreover, Mushayahama has not publicly opposed the ZANU-PF in the more than a decade that she has resided in the United States.

16

That Mushayahama and her family suspected that many of the events that occurred in Zimbabwe were politically-motivated is not sufficient to show that Mushayahama was persecuted on account of her political opinion. Mushayahama presented no evidence that the search of her family's home was conducted for any reason in particular or that her family was singled out for such an event; instead, Mushayahama testified that the soldiers were going "house to house to house" because there was a "food riot" going on. (A.R. at 73). She likewise put forth no evidence, other than personal suspicions, that her brother was killed by ZANU-PF supporters, particularly given that he was not politically active, or that she was raped because of any political opinion she may have had. (A.R. at 64). Mushayahama further testified that she had no knowledge of her rapist's identity, and nothing in the record leads to the conclusion that he was a government actor or ZANU-PF party member. Moreover, while Mushayahama testified that the family who accused her of soliciting their child to drown another student[5] were strong ZANU-PF supporters, she presented no evidence to indicate that the family had any knowledge of or reason to believe that she was not a ZANU-PF supporter, or that the family singled her out to blame because of her lack of party support. Accordingly, substantial evidence supports both the IJ and the BIA's findings that Mushayahama has not adequately demonstrated that she suffered past persecution on account of her actual or imputed political opinion.

As to Mushayahama's claim that she is more likely than not to suffer future persecution on account of her political opinion, the Country Report indicates that "the government or its agents

[5]While the IJ correctly characterized the evidence related to the incident involving the student's drowning (A.R. at 65), the BIA improperly wrote that "the couple who accused her of the drowning death of their child," (A.R. at 4). Mushayahama's testimony indicated that she was accused of encouraging the couple's son to drown another student, rather than of drowning their son. (A.R. at 111–15).

17

committed politically motivated killings during the year," as well as "unlawful killings against demonstrators," and "politically motivated abductions." (A.R. at 198–99). Most of the politically-motivated crimes, however, appear to have been perpetrated against the Movement for Democratic Change (the "MDC")[6] supporters. Mushayahama does not claim to support the MDC or that she has ever publicly supported the MDC. While the current conditions in the country indicate that Mushayahama is likely to encounter violence upon her return to Zimbabwe, as discussed below, she has not proved that it is "more likely than not that [she] would be persecuted on account of . . . [her] political opinion" if removed back to the country. 8 C.F.R. § 1208.16(b)(1)(ii); (b)(2). Additionally, while she is not required to prove that she would be singled out individually if she can "establish[] that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of [ ] political opinion," such that it is more likely than not that her life or freedom would be threatened if she returns, the Country Report's indication that there is widespread violence against MDC members does not assist Mushayahama with regard to persecution on account of her political opinion, as she has not claimed membership in that group. *See* 8 C.F.R. § 1208.16(b)(2).

**2.    Proposed Social Groups**

A social group is a group of persons who share a "common, immutable" and fundamental characteristic that "either cannot [be] change[d], or should not be required to be change[d] because it is fundamental to [the members'] individual identities or consciences." *Castellano–Chacon v.*

---

[6]The MDC is a political party in Zimbabwe, which opposes the ZANU-PF and the current president, Robert Mugabe, promotes democratic elections, and has a current power sharing arrangement with the ZANU-PF. (A.R. at 57, 100–101); *see also Gotosa v. Mukasey*, 286 F. App'x 292, 293 (6th Cir. July 11, 2008).

18

*I.N.S.*, 341 F.3d 533, 546–47 (6th Cir. 2003) (internal quotation marks and alterations omitted). Individuals in a proposed social group "must share a narrowing characteristic other than their risk of being persecuted." *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005).

### a.      Female Teachers Who Oppose the ZANU-PF

Mushayahama asserts that she was persecuted in the past on account of her membership in the proposed social group of "female teachers who are not ZANU-PF supporters." (Pet'r Br. 29). Mushayahama argues that the IJ's finding that the group is not sufficiently visible is not supported by substantial evidence in the record. Mushayahama contends that female teachers opposing the ZANU-PF are "clearly visible," despite the finding by the IJ that her status as a teacher would not be readily recognizable outside of the classroom, because female teachers are a distinct group recognizable in Zimbabwe and because her lack of support for the ruling party is "visible by negative implication" to those who expect great support for the party. (*Id.* at 30). Mushayahama also disagrees with the IJ's ruling that her profession as a teacher is not fundamental or immutable and that she should be required to change it. By discussing the importance of the profession of an educator, Mushayahama attempts to distinguish her case from the case of *In re Acosta*, where the BIA found that the applicant could be required to change his occupation as a taxi driver. 19 I. & N. Dec. 211 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).

Respondent asserts that the BIA was correct in finding that Mushayahama has not previously, nor will she in the future, be seen as opposing the ZANU-PF because she is a member of the party and did not assert her opposition to the party while in Zimbabwe. Respondent points out that only one of the incidents involving her position as a teacher, the family accusing her of involvement in

19

the drowning of a student, was directed at Mushayahama. Respondent discounts this event as unrelated to Mushayahama's membership in this proposed social group because "it appears [the parents] were looking for a scape-goat for the other child's death and likely chose her because of her role as a teacher, which necessarily includes the supervision of students." (Resp't Br. 41). Respondent further argues that the fact that Mushayahama was not personally harmed in the attack on the deputy headmaster of her school or during the 1998 beating of the individual who worked at her school shows that the incidents have no bearing on whether she was a member of her proposed social group or was targeted because of that membership. Respondent takes the position, and we agree, that we need not determine whether "female teachers opposed to the government or ruling party" is a cognizable social group for purposes of withholding of removal because Mushayahama has not demonstrated that she is a member of the group. (*See id.* at 42 n.9).

Because Mushayahama has not demonstrated that she openly opposed or spoke out against the ZANU-PF in any way while in Zimbabwe, she has not established that she fits into her proposed social group of female teachers opposed to the ruling party. Mushayahama's traits of her gender and political opinions opposing the ruling party are certainly immutable characteristics, which she either cannot or should not be required to alter. While Mushayahama testified that she would be more likely to suffer harm in Zimbabwe because of her profession as a teacher and described incidents which took place either at a school where she worked or involved individuals with whom she worked, Mushayahama provided no evidence that the events occurred because the victims were teachers, because of their genders, or because they opposed the ZANU-PF. In fact, both the school deputy who was attacked and the school clerk who was beaten were males, and Mushayahama did not describe either of them as teachers. Accordingly, the only incident Mushayahama described

20

which deals with possible persecution of a female teacher is the accusation that she was involved in the drowning of the first-grade student and, as described above, no evidence other than Mushayahama's testimony that the accusing couple were strong ZANU-PF supporters indicates that the event was politically-motivated.

Even assuming, *arguendo*, unlike the IJ found, that this proposed group is sufficiently socially visible as teachers and the possible group members' profession is sufficiently immutable not to require change, like the BIA found, Mushayahama still has not established that she either was previously or would be in the future seen as a member of this group. She instead appeared to be a party supporter while in Zimbabwe and thus would not have been seen in the past or would likely be seen in the future by the ZANU-PF as a member of the proposed social group of female teachers opposed to the government.

b.      **Citizens Returning to Zimbabwe After Long Stays Abroad**

Mushayahama additionally argues that she is more likely than not to suffer future persecution because her actions in fleeing the country without the knowledge or permission of the government in Zimbabwe and applying for political asylum in the United States will show the ZANU-PF that she is ideologically opposed to it if she returns. The IJ found that this proposed social group has the immutable characteristic that the individuals are returning from long stays abroad, but determined that the group is not sufficiently delimited or socially visible for purposes of withholding of removal.

Mushayahama contends that the group is delimited in terms of time to include only Zimbabweans who remain outside of Zimbabwe for five years or longer. Mushayahama uses this time restriction based on "the length of time after which the Zimbabwean government revokes the citizenships of persons who have left the country." (Pet'r Br. 34 (citing A.R. at 207)).

21

Mushayahama also argues that the group is sufficiently visible because those who return to Zimbabwe after five years no longer retain citizenship, and those lacking citizenship are visible as a distinct element of society.

As stated above, a "social group," as defined by the BIA, must be a group of people sharing a common, immutable characteristic, and the common defining characteristic must be one that the individual members either cannot change or that is so fundamental to their identities that they should not be required to change. *In re Acosta*, 19 I. & N. Dec. at 233; *see also Castellano-Chacon*, 341 F.3d at 546 (adopting the BIA's definition of a "social group"). Sweeping and general classifications will not usually constitute a social group for purposes of asylum or withholding of removal. *See Rreshpja*, 420 F.3d at 555.

In this case, the BIA's decision also discusses the importance of the element of "visibility" and of being recognizable to others in the country at issue. (A.R. at 4). The BIA found that Mushayahama did not adequately show that "she and other citizens returning to Zimbabwe after long absences abroad would be 'highly visible and recognizable' by others in Zimbabwean society." (*Id.*). The BIA went on to find that even if she had proved that the group was sufficiently visible, Mushayahama did not show that "it is more likely than not that she would be persecuted on such ground, whether through the nation's citizenship revocation law or through other means." (*Id.*).

As the IJ found, this proposed social group has the immutable characteristic of having spent time periods abroad. Even assuming, *arguendo*, that the group is sufficiently delimited to include only individuals having been abroad for more than five years, as suggested by Mushayahama, the group still lacks the requisite visibility to the Zimbabwean society at-large to constitute a social group for the purposes of withholding of removal. Mushayahama seeks to rely on the Citizenship

22

Act as proof of her claims related to the adequacy of this proposed social group and her inclusion in it; however, she did not provide the contents of the Act for inclusion in the record. As the IJ and the BIA found, the Country Report's brief mention of the contents of the Citizenship Act suggests that only those with claims to dual citizenship who have failed to return to the country within a five year period shall lose their Zimbabwean citizenship under the law. Mushayahama provided no evidence, such as the Citizenship Act itself or its legislative history, to rebut this finding, and she has not demonstrated that she has a claim to dual citizenship. *See Matter of Soleimani*, 20 I. & N. Dec. 99, 106 (BIA 1989) (placing the burden of proving the relevant application of foreign law on the party asserting it).

In her petition for review, Mushayahama now claims that her due process rights were violated by the BIA's discussion of the Citizenship Act and its citation to the contents of the Citizenship Act on an internet website without affording her the opportunity to respond. Mushayahama thus argues that the BIA improperly took administrative notice of a contested fact and requests that the case be remanded to allow her to submit rebuttal evidence on this issue. Respondent cites several BIA decisions standing for the proposition that a party who wishes to rely on a foreign law bears the burden of proof as to the content of the law. (*Id.* at 36); *see Soleimani*, 20 I. & N. at 106; *Matter of Ho*, 18 I. & N. Dec. 152, 155 (BIA 1981); *Matter of Annang*, 14 I. & N. Dec. 502, 502 (1973). Mushayahama did not submit the text of the Citizenship Act and instead, relies on a passage from the Country Report, which briefly references the law.

The petitioner must have exhausted all of her administrative remedies for a federal court to have jurisdiction over an appeal from an order of removal. 8 U.S.C. 1252(d)(1). This Circuit has interpreted the exhaustion requirement to mean that the petitioner must "first argue the claim before

23

the IJ or the BIA before an appeal may be taken." *Csekinek v. I.N.S.*, 391 F.3d 819, 822 (6th Cir. 2004); *Coulibaly v. Gonzales*, 220 F. App'x 400, 401 (6th Cir. 2007) (declining jurisdiction where there was "no evidence in the record that petitioner ever presented these claims to either the Immigration Judge or the Board of Immigration Appeals"). The purposes of the exhaustion requirement of § 1252(d)(1) are: "(1) to ensure that the INS, as the agency responsible for construing and applying the immigration laws and implementing regulations, has had a full opportunity to consider a petitioner's claims; (2) to avoid premature interference with the agency's processes; and (3) to allow the BIA to compile a record which is adequate for judicial review." *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004) (citations and internal quotation marks omitted). Mushayahama did not file a motion to reopen the BIA's proceedings, as is required before obtaining judicial review of the decision. *See Dokic v. I.N.S.*, 899 F.2d 530, 532 (6th Cir. 1990). Moreover, Mushayahama has not shown that the BIA would have found her proposed social group cognizable or that its decision would have been at all affected had the BIA not looked to the contents of the Citizenship Act. *See Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005) (requiring an applicant claiming a due process violation in removal proceedings to show "error and substantial prejudice" (quotation marks and citations omitted)). Accordingly, no error that may have been committed by the BIA[7] affected the outcome of the proceedings, and a remand on such grounds is not appropriate.

Regardless of whether the Citizenship Act would apply to Mushayahama upon her return to Zimbabwe, she has not sufficiently demonstrated that she would be persecuted on account of her having been absent from the country for the past decade. As Mushayahama has not proven that she

---

[7]This is not to say that the BIA did err in discussing the contents of the Citizenship Act, as it is permitted to take "administrative notice of commonly known facts such as current events or the contents of official documents[.]" 8 C.F.R. § 1003.1(d)(3)(iv).

suffered past persecution because of her membership in this proposed group in the past, Mushayahama does not enjoy the presumption that she would suffer persecution on account of her membership in the group in the future. *See* 8 C.F.R. § 1208.16(b)(1)(i). Mushayahama provided no evidence of other similarly situated returnees suffering persecution when returning to Zimbabwe. The evidence in the Country Report, when taken with her testimony and the other documents in the record, does not show that it is more likely than not that Mushayahama will be persecuted on account of her membership in the proposed social group of citizens returning after long stays abroad. *See* 8 C.F.R. § 1208.16(b)(1)(ii); (b)(2).

In sum, substantial evidence supports the BIA's finding that Mushayahama has not established that she suffered past, or is more likely than not to suffer future, persecution on account of her political opinion, real or imputed, or on account of her membership in either of the proposed social groups. Accordingly, we deny Mushayahama's petition for review as to her claim for withholding of removal under INA § 241(b)(3).

## D.    Withholding of Removal under the Convention Against Torture

Mushayahama contends that the BIA and IJ erred in determining that she is not entitled to protection under the Convention Against Torture.[8] The applicant's burden of proof to obtain relief under the CAT is to show "that it is more likely than not that he or she would be tortured if removed" to the country. 8 C.F.R. § 1208.16(c)(2). "Torture" is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or

---

[8]*See Ali v. Reno*, 237 F.3d 591, 596–97 (6th Cir. 2001), for a full description of the ratification and implementation of the Convention Against Torture in the United States.

25

coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). As set out by this court in *Mostafa v. Ashcroft*,

[i]n determining whether an alien is entitled to protection under the Convention Against Torture, all evidence relevant to the possibility of future torture in the proposed country of removal shall be considered, including, but not limited to: past torture inflicted upon the applicant; evidence that the applicant could relocate to another part of the country of removal where he or she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in the country of deportation.

395 F.3d 622, 625 (6th Cir. 2005) (alteration in original) (quoting *Matter of G-A-*, 23 I. & N. Dec. 366, 367 (BIA 2002) (en banc)); *see also* 8 C.F.R. § 1208.16(c)(3).

If an IJ determines that the applicant is more likely than not to be tortured upon return to the country of removal, protection under the CAT should be granted. 8 C.F.R. § 1208.16(c)(4). Unlike withholding of removal under the INA, no protected-ground nexus is required for relief under the CAT. *Almuhtaseb*, 453 F.3d at 751. An application for relief under the CAT "focuses on the particularized threat of torture," rather than a link to race, nationality, religion, political opinion, or membership in a social group, making it possible for a petitioner to succeed on her CAT claim despite the denial of her INA-based claim for withholding of removal. *Castellano-Chacon*, 341 F.3d at 551–52.

Mushayahama claims the IJ erred in denying her relief under the CAT because he misstated her burden of proof under the CAT to say that she had to show that it was "more likely than not that she will be detained" when she arrives in Zimbabwe, rather than that she must show that it is "more likely than not" that she will be tortured in any way upon her return. (Pet'r Br. 38–39).

26

Mushayahama claims that the past persecution she was found to have suffered is equivalent to past torture and that the past incidents are "great evidence of the likelihood of similar torture in the future." (*Id.* at 39 (citing 8 C.F.R. § 208.16(c)(3)). Mushayahama also points to her credible testimony that she fears future torture in the form of beatings, rape, electrocution, or being killed if she returns, as evidence that she will likely suffer torture. Mushayahama argues that her past persecution, when taken together with the Country Report's statements "that the government engaged in serious and systematic violations of human rights," that there were "politically-motivated killings and disappearances," and that "security forces regularly tortured detainees," shows that it is more likely than not that she will suffer torture if removed to Zimbabwe. (*Id.* at 39–40 (quoting A.R. at 62)).

The panel in *Mostafa* found that the BIA failing to mention or discuss the relevant country conditions outlined in the Country Reports in the record and discussed in an earlier BIA opinion, led to the conclusion that the BIA "failed to analyze [the petitioner's] Convention Against Torture claim in light of relevant country conditions and applicable legal precedent." 395 F.3d at 626. That panel found that had the BIA considered "all evidence relevant to the possibility of future torture" in the country, as the regulations require, the BIA may have decided the case differently. *Id.* (internal quotation marks and citations omitted). The panel thus determined that it was appropriate to remand the case to the BIA for proper consideration of the CAT claim. *Id.* (citing *Zubeda v. Ashcroft*, 333 F.3d 463, 477–78 (3d Cir. 2003); *Kamalthas v. I.N.S.*, 251 F.3d 1279, 1283 (9th Cir. 2001); *Mansour v. I.N.S.*, 230 F.3d 902, 908 (7th Cir. 2000) (all opinions where the BIA's failure to consider the country conditions in its review of a torture claim required remand)); *see also N'Diom v. Gonzales*, 442 F.3d 494, 498 (6th Cir. 2006) (noting that "[t]here is no indication in the record before us that

27

the Immigration Judge or the Board took cognizance of the dire human rights situation in Mauritania" and commenting that the BIA should explain its reasoning if it finds the "country reports that explain torture, slavery, and other human rights violations" to be "unimportant or irrelevant to the case"). Additionally, in *Mapouya v. Gonzales*, 487 F.3d 396, 414–15 (6th Cir. 2007), after finding that the IJ erroneously made an adverse credibility determination, the panel addressed that the IJ only briefly mentioned the petitioner's CAT claim, stating that the evidence fell short of relief under the CAT. In addition to the other errors in the IJ's analysis related to the adverse credibility finding, the *Mapouya* court found fault in the IJ's failure to analyze the CAT claim "through the lens of the four factors," and determined that the claim needed to be remanded for proper analysis. *Id.* at 415.

Here, the IJ found that Mushayahama suffered past persecution when he found her testimony regarding her rape and other instances through which she was victimized to have been credible. The widespread violations of human rights in the country of removal is a proper consideration when determining whether relief under the CAT is appropriate, and the Country Report and other documents in the record describe killings committed by the government or its agents, politically-motivated abductions, excessive force by police in apprehending of detaining suspects, security forces torturing citizens, arrests and beatings of civil protesters, reports of rapes by ZANU-PF members, police, and military, abuse of prisoners, arbitrary arrests and detention by police, failure by police to respond to vigilante violence, home searches and evictions by government security forces without warrants or notice, and government restrictions on academic freedom. Nothing in the record indicates that the conditions have improved since Mushayahama left Zimbabwe or since the

28

publication of the Country Report in the record, and respondent does not argue that the country conditions have changed.

Despite the mass violations of human rights and other relevant evidence related to the conditions in Zimbabwe contained in the record, neither the IJ nor the BIA discussed these conditions in their analysis related to Mushayahama's CAT claim. The BIA's only mention of the Country Report was in reference to Mushayahama's attempted reliance on the Citizenship Act for one of her proposed social groups for purposes of withholding of removal under the INA. While the BIA's brief dismissal of Mushayahama's CAT claim suggests that it found the past persecution she suffered insufficient to indicate that she is more likely than not to suffer torture in the future, this determination did not take into account the conditions in the country of return which were in the record for the BIA's review. Moreover, not only did the IJ fail to discuss the relevant country conditions, he also improperly misstated the appropriate CAT standard to imply that Mushayahama must show that it is more likely than not that she will be detained upon arrival at the airport in Zimbabwe.

We find that the BIA failed to consider "all evidence relevant to the possibility of future torture" in Zimbabwe and that the BIA "might have adjudicated [Mushayahama's] claim differently" if it had. *See Mostafa*, 395 F.3d at 626 (quotation marks and citations omitted). Accordingly, it is appropriate to remand Mushayahama's claim to the BIA for proper consideration of all relevant evidence related to future torture in the country of return.

We vacate the BIA's denial of withholding of removal under the CAT and grant Mushayahama's petition for review as to this claim.

29

### III. CONCLUSION

We **DENY** the petition for review with regard to Mushayahama's claims for asylum and withholding of removal under the INA, **GRANT** the petition with regard to Mushayahama's claim for CAT relief, and **VACATE** the decision of the BIA and **REMAND** for further proceedings.